Jonathan Stoler
Scott T. Earl
30 Rockefeller Plaza
New York, New York  10112
Tel.:  (212) 653-8700
jstoler@sheppardmullin.com
searl@sheppardmullin.com
*Attorneys for One Search Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

ONE SEARCH INC.,

               Plaintiff,

    -against-

ASHLEY HUNT,

              Defendant.

------------------------------------------------------------------ x

Case No. 21-cv-4221

**Complaint**

## COMPLAINT

Plaintiff One Search Inc. ("One Search" or the "Company"), a Delaware corporation, by

its attorneys, Sheppard, Mullin, Richter & Hampton LLP, alleges as follows for its Complaint

against defendant Ashley Hunt ("Hunt" or "Defendant"):

## INTRODUCTION

1.      This is an action for breach of contract, tortious interference and related claims

arising out of Hunt's breach of certain restrictive covenants and promises contained in a

separation agreement and general release (the "Agreement") that Hunt negotiated and signed

following his voluntarily resignation from One Search in June 2020.  Notwithstanding his

obligations under the Agreement, Hunt secretly diverted business opportunities away from the

Company to his own newly-formed, competitive business, a recruiting firm called Madison

Hunt, and to one of One Search's direct competitors, Taurus Search ("Taurus").  One Search learned of Hunt's misconduct only because Taurus's Founder and CEO, Paul McMahon ("McMahon"), accidentally sent emails to Hunt's dormant email address at One Search that detailed Hunt's improper competitive behavior to poach such business opportunities.  When One Search's CEO, Dan McCarthy ("McCarthy"), confronted Hunt about his misconduct, Hunt admitted his improper competitive activity but has since refused to repay severance payments that One Search had paid to him under the Agreement even though such payments were specifically made in consideration of Hunt's promise to comply with various obligations to the Company, including his agreement not to compete against it for a reasonable period of time. Hunt's breach of the Agreement and tortious interference with at least one of One Search's client relationships (and likely more) has unjustly enriched Hunt for the value of the severance payments made to him and any profits he may have made as a result of his breach, has robbed One Search of valuable business opportunities, and has damaged the Company's relationships with its clients.

## **PARTIES, VENUE AND JURISDICTION**

2.      Plaintiff One Search is a Delaware corporation with its principal place of business in New York, New York.

3.      Upon information and belief, Defendant Hunt is a citizen of the United Kingdom and domiciled at Cammock House, Goldsmiths Avenue, Crowborough, East Sussex, TN6 1RH, United Kingdom.  Upon information and belief, Hunt is doing business as Madison Hunt ("MH"), and MH's principal place of business is in New York, New York.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is compete diversity of citizenship.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Hunt, doing business as MH, regularly conducts business within this judicial district, Hunt engaged in his wrongful conduct within this judicial district, and the parties' underlying contract requires that this action be brought exclusively in a court in New York.

## FACTUAL ALLEGATIONS

6.      One Search is a financial recruitment company with a deep specialization in Infrastructure, Energy and Real Assets.  The Company maintains offices in London and New York, and helps some of the world's biggest banks, funds and advisors recruit the very best professionals globally.  One Search currently employs six people at its New York City location.

7.      By offer letter dated February 1, 2019 (the "Offer Letter), One Search hired Hunt on an at-will basis to work as an Associate Director based at the Company's New York City location.  *See* Exhibit A.

8.      As an express condition of Hunt's employment with One Search, Hunt was required to sign and abide by the Company's standard Nondisclosure, Noncompete, Non-solicitation and Assignment of Inventions Agreement (the "NDA").  *Id*.; Exhibit B.

9.      Among other things, by signing the NDA Hunt agreed not to compete with One Search or solicit its clients for his own benefit or the benefit of any other entity during his period of employment with One Search and for at least one year following the termination of his employment at One Search (the "Restricted Period"), regardless of the reason for his termination. *See* Exhibit B, Sec. 5(a)-(b).

10.     Specifically, Section 5(a) of the NDA provides that, during the Restricted Period, Hunt shall not, "without the prior written consent of the Company, directly or indirectly, on my own behalf or in the service or on behalf of others, whether or not for compensation, engage in any business activity,… that engages in any Competing Business in the Covered Area.  For

purposes of this Section 5(a), (i) 'Competing Business' means any business activity in which the Company is engaged at the time of [Hunt's] employment, including, but not limited to, recruiting, consulting, and placing front office finance and investment professionals with banks, investment funds, and financial advisory houses or otherwise, and (ii) 'Covered Ares' means all geographic areas of the United States and other foreign jurisdictions where the Company then has offices and/or sells (or could reasonably be expected to sell) its service…."  *See* Exhibit B, Sec. 5(a).

11.     Section 5(b) of the NDA provides that, during the Restricted Period, Hunt shall "not, directly or indirectly… (iii) solicit or induce… any person or entity that is then a customer, client, supplier or other business relation of the Company… to cease being a customer, client, supplier or business relations of the Company… or to divert all or any party of such person or entity's business from the Company…; (iv) solicit or provide any Competing Business to any customer of the Company…; or (v) assist any other person or entity in any way to do, or attempt to do, anything prohibited by" such restrictions.  *See* Exhibit B, Sec. 5(b).

12.     The NDA further provides that "[i]n the event of [Hunt's] violation of the [the non-compete and non-solicitation provisions in Sections 5(a) and 5(b)]… the Restricted Period shall be extended by a period of time equal to the period of such violation, such that the running of the Restricted Period shall be tolled during any period of such violation."  *See* Exhibit B, Sec. 5(c).

13.     The NDA expressly states that it may be modified as necessary to ensure its enforceability to the greatest extent possible.  Specifically, the NDA provides that, "[i]n the event that any provision of this [NDA] is held invalid by a court of competent jurisdiction, the remaining provisions shall nonetheless be enforceable according to their terms.  Further, in the event that any provision is held to be overbroad as written, such provisions shall be deemed

amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and enforced as amended." *See* Exhibit B, Sec. 6.

14. The NDA further provides that "if [Hunt] violates any provision of the [NDA] the Company will be irreparably harmed and will have no adequate remedy at law.  The Company shall have the right, in addition to the any other rights it may have, to obtain… injunctive relief to restrain any breach or threatened breach of, or otherwise to specifically enforce, this [NDA] without the obligation of posting a bond or provide actual damages." *See* Exhibit B, Sec. 8.

15. The NDA contains a choice of law provision stating that it is governed by New York law, and any dispute arising under the NDA must be heard in New York courts. *See* Exhibit B, Sec. 10.

16. In addition, the NDA provides for the exclusive jurisdiction of New York courts. Hunt expressly "submitted to jurisdiction of the courts located in the State of New York and any courts of appeal therefrom and hereby waive[d] any objection (on the grounds of lack of jurisdiction or *forum non convenient* or otherwise) to the exercise of such jurisdiction over [him] by any such courts. *Id*.

17. Finally, the NDA provides that the obligations contained therein survive the termination of Hunt's employment, regardless of the reason for that termination. *See* Exhibit B, Sec. 11.

18. Hunt signed the NDA on or about February 28, 2019 in connection with his commencement of employment with One Search. *See* Exhibit B.

19. Following Hunt's execution of the NDA and commencement of his employment, One Search introduced Hunt to its clients; trained him regarding the Company's business model, recruiting practices, pricing methodologies, client relationships and other confidential and

proprietary aspects of One Search's business; and granted him access to One Search's confidential client database (the "Client Database").

20.     The Client Database contains confidential, non-public details about One Search's relationships with its clients, including relevant points of contact, applicable terms and conditions of One Search's provision of services, and other essential details of the Company's relationships.

21.     Upon information and belief, prior to the commencement of his employment with One Search, Hunt had no experience providing recruiting and placement services in the Infrastructure and Energy sectors that comprise the heart of One Search's business.  Hunt also had no prior contact with One Search's clients, including but not limited to a client called LS Power.

22.     LS Power is a development, investment and operating company focused on power generation, electric transmission and energy infrastructure with headquarters in New York City. One Search has maintained an ongoing business relationship with LS Power since 2018, and has helped place multiple employees with LS Power since that time.

23.     During Hunt's period of employment at One Search, he supervised another One Search employee named Patrick Reyes ("Reyes").  Reyes was responsible for, among other things, managing One Search's day-to-day relationship with LS Power, updating any details about LS Power in the Company's Client Database, and for keeping Hunt apprised of any developments.

24.     Therefore, Hunt was privy to all relevant details concerning One Search's business relationship with LS Power.

25.     Hunt continued to work for One Search pursuant to the terms of the Offer Letter and NDA from February 2019 through May 2020.  On or about May 29, 2020 Hunt notified One

Search of his intention to voluntarily resign his employment.  Hunt's last day of work with the Company was June 2, 2020.

26.     Following Hunt's resignation, the parties negotiated terms of a separation agreement and general release (the "Agreement") containing severance benefits payable to Hunt as well as certain modifications to the restrictive covenants contained in the NDA.

27.     The Agreement was fully executed by the parties on or about June 27, 2020.  *See* Exhibit C.

28.     Pursuant to the Agreement, One Search agreed to pay Hunt a severance benefit (the "Severance Payment") in the amount of $30,000, less applicable deductions, in three equal installments of $10,000 each.  The first $10,000 installment was due within ten business days of Hunt's execution of the Agreement.  Provided Hunt continued to abide by the Agreement in all respects, the second $10,000 installment was due within 180 days of Hunt's execution of the Agreement, and the final $10,000 installment is due on or before the one year anniversary of Hunt's execution of the Agreement.  *See* Exhibit C, Sec. 3.

29.     Hunt acknowledged and agreed that he was not entitled to the Severance Payment unless he signed and abided by the Agreement.  Indeed, the Agreement expressly provides that, "[Hunt] acknowledges that the consideration set forth in… Section 3 constitutes an amount to which [Hunt] would not otherwise be entitled absent the parties' execution of Agreement."  *Id.*

30.     The Agreement provides that "in the event [Hunt] breaches this Agreement in any way, the Company shall have no obligation to make any payment that has not yet been paid, and [Hunt] shall be obligated to immediately return any payments that One Search may have made to [Hunt] prior to the date of Employee's breach."  *See* Exhibit C, Sec. 3.

31.     As consideration for receipt of the Severance Payment installment, Hunt promised "to comply in all respects" with the NDA, as amended by the Agreement.  *See* Exhibit C, Sec. 8.

32.     The Agreement amended the NDA by narrowing the restrictions on Hunt's post-termination activities that Hunt had previously agreed to as a condition of his employment, training and access to One Search's confidential and propriety information in February 2019.

33.     In fact, under the Agreement, One Search significantly reduced the scope of the non-compete provision that Hunt had agreed to when he joined the Company to permit Hunt to engage in a broader range of business activities that would otherwise have been strictly prohibited under the NDA.

34.     Specifically, after August 2, 2020, the Agreement modified the NDA by permitting Hunt to provide "Competitive Services" otherwise prohibited under the NDA to investment banks that offered mergers and acquisitions or debt advisory services, except for eleven specific "prohibited entities".  *See* Exhibit C, Sec. 8(b).

35.     The Agreement further modified the NDA to permit Hunt to provide recruitment and placement services after August 2, 2020 to individuals in One Search's existing candidate base in connection with employment opportunities at investment banks so long as those banks were not among the list of eleven prohibited entities delineated in Section 8(b) of the Agreement. *See* Exhibit C, Sec. 8(c).

36.     The Agreement is governed by New York law, and the parties consented to personal jurisdiction in New York in any action commenced to enforce its terms or the terms of the accompanying NDA.  *See* Exhibit C, Sec. 18.

37.     On or about July 9, 2020, One Search paid Hunt the first $10,000 installment of the Severance Payment due under the Agreement.

38.     On or about November 30, 2020, One Search paid Hunt the second $10,000 installment of the Severance Payment due under the Agreement.

39.     Notwithstanding the parties' Agreement and the fact that One Search had paid all amounts due under the Agreement, in February 2021, the Company learned that Hunt was actively assisting a One Search competitor, Taurus, to place a prospective employee with One Search's long-standing client, LS Power.

40.     Specifically, on February 19, 2021, Taurus's Founder and CEO, McMahon, forwarded Hunt an email exchange between McMahon and a representative at LS Power regarding a candidate to fill a senior-level employment opportunity at LS Power (the "LS Power Opportunity").  In his email (the "First Email"), McMahon advised Hunt: "And the list grows!! Let me know if you wanna chat or if you're busy I can get [the candidate's] availability etc."

41.     McMahon sent a second email to Hunt on February 19, 2021 (the "Second Email"), in which McMahon forwarded other communications with LS Power regarding the LS Power Opportunity.

42.     Based on the First and Second Emails, the LS Power Opportunity appears to relate to placement of a very senior level employee who would command total annual compensation package of least $1,000,000.  Because One Search's fees are typically determined in large part by the total compensation of the candidates it places with its clients, if One Search had been aware of and able to place a candidate in connection with the LS Power Opportunity, its fees for that placement would have been at least $100,000.

43.     As such, the LS Power Opportunity is exactly the type of senior-level placement opportunity that justifies One Search's cost in both time and money of building and maintaining its long-term business relationships with LS Power and other clients.

44.     McMahon sent the First and Second Emails to Hunt's email address at One Search, which is ashley.hunt@one-search.com.  That email address has been dormant since Hunt's June 2020 resignation, but it is still capable of receiving incoming email messages.

-9-

45.     When McMahon's First and Second Emails were received in Hunt's dormant One Search email account, they were forwarded to One Search's CEO, McCarthy.  Upon his receipt and review of the First and Second Emails, it was obvious to McCarthy that Hunt had been helping McMahon and Taurus place at least one prospective employee with LS Power.

46.     As noted above, One Search had a business relationship with LS Power dating back to 2018.

47.     Throughout his period of employment with One Search, Hunt had access to all of One Search's confidential information regarding its business relationship with LS Power, including but not limited to pricing details, One Search's prior employee placements at LS Power, and One Search's personal relationships with appropriate points of contact at LS Power.

48.     LS Power is not an investment bank engaged in mergers and acquisitions or debt advisory services.  As such, LS Power is not an entity for which Hunt is permitted to provide recruiting or placement services pursuant to the NDA as modified by Section 8 of the Release Agreement.

49.     In any event, Taurus is a direct competitor of One Search.  Therefore, any assistance Hunt provided to Taurus would be in violation of Hunt's NDA, as amended by the Agreement.

50.     Moreover, upon information and belief, Taurus had never worked with LS Power prior to Hunt's resignation from One Search.  Accordingly, upon information and belief, were it not for Hunt's breach of his obligations to One Search and improper assistance, Taurus would not have even been aware of or able to pursue the LS Power Opportunity.

51.     For these reasons, McCarthy concluded that Hunt had breached his obligations to One Search by helping Taurus attempt to place a prospective employee with One Search's long-standing client.

52.     Upon information and belief, Hunt learned from a mutual acquaintance that McCarthy had discovered Hunt's assistance to Taurus in attempting to fill the LS Power Opportunity.  Shortly thereafter, on February 24, 2021, Hunt contacted McCarthy by telephone to discuss his actions.

53.     During that February 24, 2021 telephone call, McCarthy informed Hunt that One Search had received McMahon's First and Second Emails because McMahon sent them to Hunt's dormant One Search email address.

54.     McCarthy explained that it appeared obvious to him that Hunt had breached his obligations under the Agreement and the NDA, and he demanded an explanation for Hunt's misconduct.

55.     During the February 24, 2021 telephone call, Hunt admitted that he had assisted Taurus in its search for a candidate to fill the role at LS Power.

56.     Hunt also admitted to McCarthy that his actions on Taurus' behalf constituted a breach of his obligations to One Search under the NDA and the Agreement, and he apologized to McCarthy for his breach.

57.     It is clear from the facts and from Hunt's admissions to McCarthy that Hunt knowingly and surreptitiously sought to divert the LS Power Opportunity away from One Search and to himself and/or to Taurus even though LS Power was and remains an existing client of One Search.

58.     By secretly assisting One Search's direct competitor, Taurus, in its attempt to place a candidate with LS Power, Hunt breached his obligations under the Agreement and the NDA not to compete with One Search or solicit One Search's clients.

59.     One Search only learned of Hunt's breach regarding LS Power because McMahon accidentally sent the First and Second Emails to Hunt's dormant One Search email address.

Upon information and belief, Hunt's improper assistance to Taurus in attempting to fill the role at LS Power is not the only instance in which Hunt has breached his obligations under the Agreement and the NDA and tortiously interfered with One Search's client relationships.

60.     Moreover, One Search expects that there are many more communications between Taurus and Hunt concerning the LS Power Opportunity beyond the First and Second Emails that McMahon happened to send to Hunt's dormant One Search email address.

61.     By letter dated March 3, 2021, One Search, through its legal counsel, demanded that Hunt cease and desist from any further violations of the Agreement or the NDA.  One Search also proposed certain settlement terms to remedy Hunt's admitted breach of the Agreement and NDA with respect to his assistance to Taurus in attempting to fill a job placement at One Search's client, LS Power.

62.     By letter dated March 12, 2021, One Search, through its legal counsel, advised Hunt that One Search intended to pursue its claims against Hunt stemming from his breach of the Agreement and the NDA.

63.     To date, Hunt has refused to repay his severance payments or compensate One Search for the breaches of his obligations and the harm done to its business.

## COUNT I

(Breach of Contract)

64.     One Search repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

65.     The NDA entered into between One Search and Hunt is a valid and enforceable contract, supported by valid consideration.

66.     The Agreement entered into between One Search and Hunt, which modified the NDA, is a valid and enforceable contract, supported by valid consideration.

67.     One Search fully performed all of its obligations under the NDA by employing Hunt from February 2019 up to his voluntary resignation in May 2020, by training Hunt during his employment period, and by sharing One Search's confidential and proprietary business information with Hunt in connection with his employment.

68.     One Search has fully performed all of its obligations under the Agreement by timely paying him the first two installments of the Severance Payment pursuant to the payment schedule set forth in the Agreement.

69.     Under the NDA, Hunt agreed that, for one year following his June 2, 2020 voluntary resignation, he would not, "without the prior written consent of the Company, directly or indirectly, on my own behalf or in the service or on behalf of others, whether or not for compensation, engage in any business activity,… that engages in any Competing Business in the Covered Area."  *See* Exhibit B, Sec. 5(a).

70.     In addition, Hunt agreed under the NDA that, for one year following his June 2, 2020 voluntary resignation, he would not, "directly or indirectly… (iii) solicit or induce… any person or entity that is then a customer, client, supplier or other business relation of the Company… to cease being a customer, client, supplier or business relations of the Company… or to divert all or any party of such person or entity's business from the Company…; (iv) solicit or provide any Competing Business to any customer of the Company…; or (v) assist any other person or entity in any way to do, or attempt to do, anything prohibited by" such restrictions. *See* Exhibit B, Sec. 5(b).

71.     Under the Agreement, Hunt reaffirmed his promise to abide by the NDA, except that the Agreement modified the NDA by permitting Hunt to provide certain "Competitive Services" otherwise prohibited under the NDA to select investment banks that offered mergers and acquisitions or debt advisory services, and by permitting Hunt to provide recruitment and

placement services to individuals in One Search's existing candidate base in connection with employment opportunities at such investment banks. *See* Exhibit C, Sec. 8(b)-(c).

72.     Despite Hunt's promises, he breached the Agreement and the NDA by soliciting business from and providing services to current and former One Search clients on behalf of himself and/or on behalf of One Search's competitors during the Restricted Period.

73.     Despite Hunt's promises, he breached the Agreement and the NDA by assisting One Search's direct competitor, Taurus, to compete with One Search for recruitment and placement opportunities at One Search's clients during the Restricted Period.

74.     As a result of Hunt's blatant violation of the Agreement, One Search has suffered damages in an amount to be determined at trial.

<u>**COUNT II**</u>

(Tortious Interference Regarding
<u>One Search's Business Relationships With Its Customers</u>)

75.     One Search repeats and realleges paragraphs 1 through 74 as if fully set forth herein.

76.     At all relevant times, One Search has maintained long-standing business relationships with dozens of clients, including but not limited to LS Power.

77.     One Search first contracted with LS Power to help it recruit candidates for employment in 2018.

78.     As a One Search employee, Hunt was aware of One Search's long-standing business relationship with LS Power and with other customers.

79.     Despite Hunt's knowledge of One Search's long-standing business relationships with LS Power and other clients, Hunt, either alone or in concert with Taurus and/or other One Search competitors, intentionally interfered with those relationships by poaching placement opportunities with those One Search clients.

80.     For example, in or about February 2021, Hunt assisted Taurus in attempting to place a candidate with LS Power.

81.     As a result of Hunt's intentional interference, One Search business relationship with LS Power has been diminished.  Indeed, since execution of the Agreement and as a direct result of Hunt's misconduct, One Search has been unable to obtain additional requests for recruitment or placement services from LS Power.

82.     Based on One Search's long-standing business relationships with LS Power, it is likely that One Search would at a minimum have been given the opportunity to propose candidates for the job placement at LS Power that Hunt improperly sought to fill with Taurus's help in February 2021.

83.     As a result of Hunt's intentional interference, One Search has suffered damages including, but not limited, to the receipt of revenues that One Search otherwise would have earned and been entitled to but for Hunt's tortious interference.

84.     As a result of his tortious interference, Hunt has damaged One Search in an amount to be determined at trial, plus One Search's attorneys' fees, costs, and both pre- and post-judgment interest at the statutory interest rate.

## COUNT III

### (Unjust Enrichment)

85.     One Search repeats and realleges paragraphs 1 through 84 as if fully set forth herein.

86.     Hunt has benefited from and has been enriched by One Search's payments to him under the Agreement and the NDA.

87.     Upon information and belief, Hunt has also benefited from payments and benefits of undisclosed amounts from Taurus and/or other One Search competitors in connection with

Hunt's provision of recruiting services in violation of the Agreement and the NDA, including but not limited to Hunt's assistance to Taurus in its efforts to fill a placement opportunity with One Search's client, LS Power.

88.     Hunt has failed to perform his obligations for the benefits he has received from One Search under the Agreement and the NDA.

89.     Hunt's failure to perform his obligations and abide by the Agreement and the NDA has been to One Search's detriment.

90.     By reason of the foregoing, One Search has suffered damages in an amount to be determined at trial.

## COUNT IV

### (Injunctive Relief)

91.     One Search repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

92.     Under the Agreement and the NDA, the parties agreed that the Restricted Period of Hunt's post-termination restrictions would last until at least June 2, 2021.

93.     Notwithstanding the anticipated June 2, 2021 termination date of the Restricted Period, the NDA also provides that "[i]n the event of [Hunt's] violation of the [the non-compete and non-solicitation provisions in Sections 5(a) and 5(b)]… the Restricted Period shall be extended by a period of time equal to the period of such violation, such that the running of the Restricted Period shall be tolled during any period of such violation." *See* Exhibit B, Sec. 5(c).

94.     Hunt agreed in Section 8 of the NDA that, in event of a breach of the restrictive covenants contained therein, One Search would be entitled seek injunctive relief in addition to any other damages.  Specifically, the NDA provides that:

> [I]f [Hunt] violates any provision of the [NDA] the Company will be irreparably harmed and will have no adequate remedy at law.  The

> Company shall have the right, in addition to the any other rights it may
> have, to object… injunctive relief to restrain any breach or threatened
> breach of, or otherwise to specifically enforce, this [NDA] without the
> obligation of posting a bond or provide actual damages.

Exhibit B, Sec. 8.

95.     By working with or for Taurus and/or other One Search Competitors to place prospective employment candidates with One Search's clients, Hunt has breached the restrictive covenants set forth in the Agreement and the NDA.

96.     Accordingly, based on Hunt's breach of the restrictive covenants set forth in the Agreement and the NDA, One Search is entitled to an injunction prohibiting Hunt from engaging in any competitive activity otherwise proscribed under the parties' Agreement and NDA.

97.     One Search is also entitled to an extension of the Restricted Period to reflect the tolling of the Restricted Period during Hunt's period of violation of the Agreement and NDA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff One Search Inc. respectfully seeks judgment on its Complaint as follows:

(a)     On the First Count, awarding Plaintiff damages for Defendant's breach of the Agreement in an amount to be determined at trial, plus its costs and both pre- and post-judgment interest at the statutory rate;

(b)     On the Second Count, awarding Plaintiff damages for Defendant's tortious interference with Plaintiff's business relationships in an amount to be determined at trial, plus its attorneys' fees, costs, and both pre- and post-judgment interest at the statutory rate;

(c)     Awarding Plaintiff damages for Defendant's unjust enrichment in an amount to be determined at trial, plus its attorneys' fees, costs, and both pre- and post-judgment interest at the statutory rate;

(d)      Tolling the Restricted Period and enjoining Defendant from competing with One

Search, from soliciting One Search's employees or clients, or otherwise violating the terms of the

parties' NDA until such date to be determined at trial;

(e)      Awarding Plaintiff its costs and attorneys' fees incurred in connection with this

Action;

(f)      Awarding Plaintiff pre-judgment interest on its judgment; and

(g)      Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated:  New York, New York
         May 11, 2021                       Respectfully submitted,

                                            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

                                    By:  /s/ Jonathan Stoler
                                         _____
                                         Jonathan Stoler
                                         Scott T. Earl
                                         30 Rockefeller Plaza
                                         New York, New York  10112
                                         Tel.:  (212) 653-8700
                                         jstoler@sheppardmullin.com
                                         searl@sheppardmullin.com
                                         *Attorneys for One Search Inc.*